IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WAYNE R. GOLD, Regional Director of Region 5 of the National Labor Relations, for and on behalf of the NATIONAL LABOR RELATIONS BOARD | : | |
| Petitioner | : | CIVIL NO. CCB-05-3147 |
| v. | : | |
| MID-ATLANTIC REGIONAL COUNCIL OF CARPENTERS | : | |
| Respondent | : | |

...o0o...

**MEMORANDUM**

Petitioner Wayne R. Gold, Regional Director of Region 5 of the National Labor Relations Board, under the authority of the Board's General Counsel ("the GC" ), has filed a petition for a preliminary injunction, under § 10(l) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160 (l), against respondent Mid-Atlantic Regional Council of Carpenters ("the Union"), pending the resolution of an unfair labor practices complaint filed with the Board. Specifically, the GC seeks to enjoin the Union's practice of displaying a large stationary banner outside of the office building that houses Goodell, DeVries, Leech & Dann, LLP ("Goodell"). The issues have been briefed fully, and oral argument was heard on December 16, 2005. Based on the following analysis, the petition will be denied.

I. Background

The facts of the case are essentially not in dispute. Goodell, a law firm with approximately 100 employees, leases three floors in the Alex Brown Building at One South Street in downtown

Baltimore. The building's main entrance consists of four glass doors facing west on South Street. The building is otherwise bounded to the north by Baltimore street (with no entrances), to the east by Commerce Street (with an entrance to the loading dock), and to the south by a public courtyard (with an entrance to a restaurant that does not connect with the lobby).

Goodell hired Constantine Commercial Construction, Inc. ("Constantine") as a general contractor for its office renovation in January 2005.[1] Constantine subcontracted with Starkey Construction Co., Inc. ("Starkey") for drywall work. It is unclear exactly when Starkey began its work on the project, but it finished in mid-October, and does not plan to return. The Union has a dispute with Starkey over its wage and benefit practices, but does not have a dispute with Constantine or Goodell regarding the treatment of their respective employees.

Since mid-May, the Union has engaged in various activities outside the building protesting Starkey's work on the site. Originally, the Union engaged in a picket line, displayed a large inflatable rat on a parked truck, and handed out handbills explaining the nature of the dispute. Since on or about August 9 and continuing to the present, the Union has established and maintained a four-foot-high by 20-foot-long banner near the entrance to the Building on a regular if not daily basis. The center of the white banner reads "SHAME ON GOODELL, DEVRIES, LEECH & DANN, LLP" in large block dark letters, on both sides of which "LABOR DISPUTE" is printed in smaller italicized red block letters. It is made of a heavy cloth-like material held up by a plastic pipe frame, and cannot stand upright on its own. The banner is positioned parallel to, and facing out from, the building on the South Street sidewalk approximately 30 feet north of the entrance, such that it is near the corner of Baltimore Street and clearly visible to eastbound traffic on that street. Between two and four

[1] All subsequent dates occurred in 2005.

Union members hold up, or stand near, the banner in shifts, but they do not move or carry it aloft, nor do they chant, sing, or shout anything. They also hand them out the explanatory handbills on request, but do not actively distribute them. The Union states that it positions the banner from around 9:00am until around 3:00pm, but the Goodell managing partner stated that she has seen the banner as early as 8:00am and as late as 4:00pm. It is unclear when the Union ceased other methods of protest, but the banner is the only practice at issue in this case.

Goodell filed a charge with the NLRB against the Union on August 15. After an investigation, the GC filed an administrative complaint with the Board on November 17, and filed the petition for a preliminary injunction with the district court on November 22. The initial hearing before a Board Administrative Law Judge had been set for December 21.[2]

The GC has brought several prior cases around the country to curb similar instances of "bannering," charging that the practice violates § 8(b)(4)(ii)(B) of the NLRA, which prohibits certain forms of so-called "secondary boycotts." So far, six Board ALJs have rejected the GC's

[2] I presume that this actually took place as scheduled. To be clear, the GC seeks a preliminary injunction that would remain in effect until the final disposition of the case by the full NLRB, not just until the ALJ issues a decision.

theory of violation,[3] while two have accepted it to some degree.[4] The NLRB has yet to issue a final ruling on any of these cases. The three district courts that have considered petitions for preliminary injunctions as to the practice have declined to order the injunctions,[5] and one of these decisions was affirmed by the Ninth Circuit in June 2005.[6] Relying on these successes, the Union here consciously tailored its bannering practice very closely to what has been upheld by these federal courts. Although the applicable procedural standards here might differ from those used by the other federal courts, I largely agree with their substantive analyses in declining to issue a preliminary injunction.

II. Analysis

[3] *Southwest Regional Council of Carpenters, et al. (Carignan Construction Co.)*, Case 31-CC-2113, JD(SF)-14-04, 2004 WL 359075, dated February 18, 2004; *Southwest Regional Council of Carpenters (New Star Gen. Contractors)*, Cases 27-CC-877 et al., JD(SF)-76-04, 2004 WL 2671638, dated November 12, 2004; *Carpenters Local No. 1506 (Sunstone Hotel Investors)*, Cases 31-CC-2121 et al., JD(SF)-01-05, 2005 WL 77044, dated January 6, 2005; *United Bhd. of Carpenters Locals 184 and 1498 (Grayhawk Dev.)*, Cases 28-CC-973 et al., JD(SF)-02-05, 2005 WL 195115, dated January 13, 2005; *Southwest Regional Council of Carpenters (Held Properties)*, Cases 31-CC-2126 et al., JD(SF)-29-05, 2005 WL 831458, dated April 5, 2005; *Southwest Regional Council of Carpenters (Richie's Installations)*, Cases 21-CC-3337 et al., JD(SF)-59-05, 2005 WL 2071662, dated August 22, 2005.

[4] *Local Union No. 1827, United Brotherhood of Carpenters and Joiners of America, et al. (United Parcel Service, Inc., et al.)*, Cases 28-CC-933 et al., JD(SF)-30-03, 2003 WL 21206515, dated May 9, 2003; *Southwest Regional Council of Carpenters (Held Properties, Inc.)*, Case 31-CC-2115, JD(SF)-24-04, 2004 WL 762435, dated April 2, 2004.

[5] *Overstreet v. United Bhd. of Carpenters and Joiners of America, Local 1506*, 2003 WL 23845186 (S.D. Cal., May 7, 2003); *Benson v. United Broth. of Carpenters and Joiners, Locals 184 and 1498*, 337 F.Supp.2d 1275 (D.Utah 2004); *Kohn v. Southwest Regional Council of Carpenters*, 289 F.Supp.2d 1155, 1163 (C.D. Cal. 2003).

[6] *Overstreet v. United Bhd. of Carpenters and Joiners of America, Local 1506*, 409 F.3d 1199 (9th Cir. 2005). It does not appear that the GC filed an appeal in *Benson* or *Kohn*.

The GC alleges that the Union's banner constitutes an "unfair labor practice" in violation of § 8(b)(4)(ii)(B) of the National Labor Relations Act. This section reads:

> (b) Unfair labor practices by labor organization
> It shall be an unfair labor practice for a labor organization or its agents–
>
> (4)... (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person...

29 U.S.C.A. § 158(b)(4)(ii)(B). The GC notes that the Supreme Court characterized an earlier version of this section as reflecting "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear upon offending employers in primary labor disputes and of shielding unoffending employers and others from pressure in controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council (Gould & Preisner)*, 341 U.S. 675, 692 (1951). The GC seeks a petition for a preliminary injunction under § 10(l) of the Act, which reads in relevant part:

> (l) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process
>
> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title...the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of

law...

29 U.S.C.A. § 160.

There are two relevant standards in § 10(l), "reasonable cause" and "just and proper." The Fourth Circuit has directed district courts first to focus on the former: "When considering a petition for temporary relief under Section 10(l), the function of the district court is not to decide the merits of the case but to determine whether the Regional Director has reasonable cause to believe that the respondents are violating the Act." *Humphrey v. Int'l Longshoremen's Assoc.*, 548 F.2d 494, 497 (4th Cir. 1977).[7] The *Humphrey* court relied on "Judge Friendly's well-reasoned opinion" in *Danielson v. Joint Bd. Of Coat, Suit & Allied Gar. Wkrs. U.*, 494 F.2d 1230 (2nd Cir. 1974) in rejecting the standard used by some circuits whereby the injunction should issue unless the GC's position is "insubstantial and frivolous," as this would be an "abandonment of traditional equitable discretion." *Humphrey*, 548 F.2d at 497-98. "However, while a temporary injunction should not issue unless there is some reasonable possibility that the Board will ultimately enter an enforceable order, the General Counsel's resolution of disputed issues of law and fact should be accorded considerable deference in determining whether such possibility exists." *Id.* at 498.[8] The court

---

[7] Some courts have held that "reasonable cause" only applies to the GC's internal decisionmaking, and thus is not a standard for the court to apply in ruling on an injunction. *See Kohn*, 289 F.Supp.2d at 1163 (noting emphatically that "in § 10(l) the 'reasonable cause' requirement has to do with the Board's own obligations under the Act – not with a constraint on the equitable powers of the district court once its jurisdiction has been properly invoked") (quoting *Miller v. California Pacific Medical Center*, 19 F.3d 449, 456-57 (9th Cir. 1994)). Whatever merit this analysis might have, the Fourth Circuit has clearly mandated a different reading of § 10(l).

[8] The GC quotes this language for the proposition that he needs only to show such a "reasonable possibility" in order to satisfy the reasonable cause requirement, but that turns a necessary element into a sufficient one.

emphasized that where the GC presents a new theory of violation in a "complex industrial situation" that has not been fully considered by the board, a district court should be "especially reluctant to conclude that the General Counsel's contentions are without merit." *Id.* Thus, in general, *Humphrey* requires that district courts give "considerable deference" to the GC's determination of reasonable cause, though they maintain the equitable discretion to reject even theories that might rise above "insubstantial and frivolous."

Nonetheless, there are several factors that mitigate the degree of deference due to the GC here. As the present case involves speech-related conduct in a public forum, this court has an independent responsibility to consider its potential First Amendment implications. *See Edward DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574-75 (1988) ("*DeBartolo*") (holding that any *Chevron* deference normally due to the NLRB was superceded by the constitutional avoidance doctrine); *Overstreet*, 409 F.3d at 1208 n.12 ("[T]his case's First Amendment backdrop prevents us from taking into account any ultimate deference to the Board.").[9] The *Humphrey* court, in contrast, was confronted with a quintessentially "complex industrial situation" – i.e., whether certain union activities constituted "work acquisition" or "work preservation" measures – that went to the core of the Board's area of expertise. 548 F.2d 497-98.

---

[9] Not only would I need to decide whether construing § 8(b)(4)(ii)(B) to cover the banner here might generate "significant constitutional problems," *DeBartolo*, 485 U.S. at 568, I would also need to consider the particular implications of granting a preliminary injunction, in light of the Supreme Court's "prior restraint" jurisprudence. *See, e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) ("The special vice of a prior restraint is that communication will be suppressed...before an adequate determination that it is unprotected by the First Amendment."). Although such considerations affect the degree of deference due to the GC, I need not ultimately address these difficult questions, given my determination that the GC lacks "reasonable cause" to believe that the banner constitutes a violation of § 8(b)(4)(ii)(B).

In addition, while the Fourth Circuit has not has an opportunity to interpret fully the“just and proper,” standard, the Supreme Court held in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) that courts considering a preliminary injunction petition should not forego their traditional equitable discretion unless Congress has expressly, or "by inescapable inference" sought to control the exercise of that discretion. *Id.* at 313; *see also D'Amico v. Townsend Culinary, Inc.*, 22 F.Supp.2d 480, 484-86 (D.Md. 1980) (holding, in light of *Romero-Barcelo* and ambiguities in Fourth Circuit law, that a court should apply traditional equitable principles in making its "just and proper" determination in a § 10(j) proceeding).[10]

With these principles in mind, I now turn to an analysis of the GC's theory that the Union's banner violates § 8(b)(4)(ii)(B). GC's primary theory of violation is that the Union's banner, by itself, constitutes "coercion" within the meaning of § 8(b)(4)(ii)(B). The NLRB has defined this "coercion" element as "nonjudicial acts of a compelling or restraining nature, applied by way of concerted self-help consisting of a strike, picketing, or other economic retaliation and pressure in the background of a labor dispute." *See Carpenters Kentucky State Dis. Council (Wehr Constr.*,

[10] The GC argues that "just and proper" should be read to mean that the court only has discretion to tailor the requested injunction, but not to apply traditional equitable principles. In essence, the GC contends that the court *must* grant the injunction as long as it finds that there is "reasonable cause," which it should view with considerable deference to the GC. *Humphrey* did not clearly state this principle, *see* 548 F.2d at 500 n.25; furthermore, any suggestion that it did would be undercut by *Romero-Barcelo*. On the other hand, the Union makes a novel argument that the court should apply traditional equitable balancing as part of its "reasonable cause" analysis. Ultimately, I see no need to reach the precise meaning of "just and proper" or the role of traditional equitable balancing, again due to my disposition of this case under the "reasonable cause" analysis. If I were to apply traditional equitable balancing, however, I would have to consider the speculative nature of the harms to Goodell and to interstate commerce generally, as well as the likelihood that the Union will prevail on the merits.

*Inc.)*, 308 NLRB 1129, 1130 n.2 (1992) (citing cases).[11]

The leading Supreme Court case on the meaning of "coercion" in § 8(b)(4)(ii)(B) is *DeBartolo*, which must direct the court's analysis more than any NLRB decision.[12] In that case, the respondent union had a primary labor dispute with a construction company working in the petitioner's shopping mall. *See id.* at 570-71. The union distributed leaflets that "made clear that the union was seeking only a consumer boycott" against the entire mall in order to pressure the mall owner to use contractors paying "fair wages and fringe benefits." *Id.* The NLRB had found that the union's leaflets "constitute[d] 'economic retaliation' and [were] therefore a form of coercion" prohibited by § 8(b)(4)(ii)(B). *Id.* at 573. The *DeBartolo* court disagreed, reasoning that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* at 575 (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499-501

[11] The GC also points to a broader Board statement that § 8(b)(4) "proscribes all conduct where it was the union's intent to coerce, threaten or restrain third parties to cease doing business with a neutral employer." *Teamsters Local 122 (August A. Busch & Co.)*, 334 NLRB 1190, 1204 (2001). However, the Supreme Court has clearly suggested that such a construction, based only on intent, is unreasonable. *See DeBartolo*, 485 U.S. at 579 (noting that it is "untenable...that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the employer involved in the labor dispute is 'coercion' within the meaning of § 8(b)(4)(ii)(B)"). Rather, "the prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise." *NLRB v. Fruit and Vegetable Packers and Warehousemen Local 760 (Tree Fruits)*, 377 U.S. 58, 68 (1964).

[12] On a minor point, this case is sometimes referred to as "*DeBartolo II*" given that the Supreme Court issued an earlier decision in the case remanding it to the lower courts, *Edward J. DeBartolo Corp. v. NLRB*, 463 U.S. 147 (1983). Since only the second opinion is relevant to the present issue, some courts have referred to it solely as "*DeBartolo*." The summary of *DeBartolo* here is largely based on Judge Feess' cogent synopsis in *Kohn*. *See* 289 F.Supp. at 1166.

(1979)). The Court then found that "the Board's construction of the statute, as applied in this case, poses serious questions of the validity of § 8(b)(4) [(ii)(B)] under the First Amendment." *Id.* The *DeBartolo* court further reasoned:

> The case turns on whether handbilling such as involved here must be held to "threaten, coerce, or restrain any person" to cease doing business with another, within the meaning of § 8(b)(4)(ii)(B). We note first that "inducing or encouraging" employees of the secondary employer to strike is proscribed by § 8(b)(4)(i). But more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii): that section requires a showing of threats, coercion, or restraints. Those words, we have said, are "nonspecific, indeed vague," and should be interpreted with "caution" and not given a "broad sweep[.]"...There is no suggestion that the leaflets had any coercive effect on customers of the mall. There was no violence, picketing, or patrolling and only an attempt to persuade customers not to shop in the mall.

*Id.* at 578 (citation omitted). Accordingly, the Court ruled that the handbilling activity before it did not violate § 8(b)(4)(ii)(B). *See id.* at 587. The *DeBartolo* court distinguished *NLRB v. Retail Store Employees* (*Safeco*), 447 U.S. 607 (1980), where it held that consumer picketing urging a general boycott of a secondary employer aimed at causing him to sever relations with the union's real antagonist was coercive and forbidden by § 8(b)(4). The *DeBartolo* case first noted that "picketing is qualitatively different from other modes of communication." 485 U.S. at 580 (citations omitted), and that the picketing in *Safeco* "actually threatened the neutral with ruin or substantial loss." *Id.* The Court then quoted Justice Stevens' concurrence in *Safeco*, which reasoned that picketing is a "mixture of conduct and communication" and the conduct element "often provides the most persuasive deterrent to third persons about to enter a business establishment." *Id.* (quoting *Safeco*, 447 U.S. at 619 (Stevens J., concurring)). Handbills, on the other hand, depend entirely on the persuasive force of their ideas. *See id.*

The GC argues that bannering is more like picketing than handbilling, contending that the banner creates a symbolic and confrontational barrier tantamount to a picket line. He cites a variety

of cases holding that the traditional hallmarks of picket signs and patrolling are not necessary to finding that a union's conduct is the equivalent to traditional picketing. There are, indeed, several cases that find activity other than picketing to constitute "coercion," but they all rely on some physical dimension that rises above "mere persuasion." *See Pye v. Teamsters Local Union No. 122*, 61 F.3d 1013 (1st Cir. 1995) (coordinated group shopping that physically clogged liquor stores); *Moore-Duncan v. Carpenters Metropolitan Regional Council of Philadelphia*, 162 LLRM 2615, 1999 WL 960999, at *1 (E.D. Pa. 1999), *aff'd* 225 F.3d 649 (3rd Cir. 2000) (broadcast of protest via amplification set at excessively high noise levels); *Kentov v. Sheet Metal Workers' Int'l Assoc. Local 15*, 418 F.3d 1259 (11th Cir. 2005) (mock funeral outside hospital involving music and patrolling).[13] In fact, the *Kentov* court distinguished *Overstreet* precisely on the grounds that bannering did not involve any physical conduct, unlike a mock funeral. *Id.* at 1264 n.7.

The GC tries to establish the "conduct" element here through several factors. First, he points to the presence of union agents outside of the building, relying on NLRB decisions stating that the most important feature of picketing is the posting of individuals at the entrances and exits of a business. *See Lumber & Sawmill Workers Local 2797 (Stoltze Land & Lumber Co.*), 156 NLBR 388, 394 (1965). To the extent handbilling also involves the posting of individuals outside a business, however, this factor should be accorded little or no weight under *DeBartolo*. *See Overstreet*, 409 F.3d at 1211.

[13] Another case cited by the GC, *NLRB v. Electrical Workers (IBEW) Local 769 (Ets-Hokin Corp.)*, 405 F.2d 159 (9th Cir. 1968) involved a union's threat to cancel a labor agreement with a neutral employer. Even though such an action was only verbal, it violated the separate prohibition against "threaten[ing]" in § 8(b)(4)(ii)(B). *See id.* at 161.

The GC also relies on the mere presence and size of the sign.[14] Although the GC concedes that an outdoor billboard advertisement would not be coercive, he tries to distinguish this banner due to its proximity to the entrance and its human companions. These distinctions are negligible as to the coercive effect of the banner.[15] The GC further argues that the words "labor dispute" on the banner inherently inject the element of confrontation. This argument, however, impermissibly focuses on the content of the message: to view aggressive words as "conduct" would nullify the crucial conduct/communication distinction made in *DeBartolo* and *Safeco*. *See Kohn*, 289 F.Supp.2d at 1166-67. In addition, the GC's theory that the message of the banner amounts to "economic coercion" likewise impermissibly conflates the intent of the Union's communication with its coercive nature. *See Tree Fruits*, 377 U.S. at 58; *Kohn*, 289 F.Supp.2d at 1167.

Ultimately, the GC's strongest argument is that the totality of the circumstances surrounding the banner "evoke[s] the image of a picket line" and creates a confrontational barrier that forces

---

[14] The GC cites two cases for the proposition that the mere presence of signs can make individuals feel restrained. *NLRB v. United Furniture Workers (Jamestown Sterling Corp.)*, 337 F.2d 936, 940 (2d Cir. 1964) and *Honolulu Typographical Union No. 37 (Hawii Press Newspapers, Inc.) v. NLRB, 401 F.2d 952, 957 (D.C. Cir. 1968)*. Both cases predated *DeBartolo*, and the latter was specifically distinguished by the Supreme Court because it involved actual picketing. *See DeBartolo*, 485 U.S. at 579 n.3.

[15] The banners at issue in the previous federal court and ALJ decisions were positioned at various distances from the neutral employer, but the exact distances did not seem to have factored significantly into any of those decisions. In one case before an ALJ who rejected the GC's theory, a banner might have been located as few as three feet from the entrance to a driveway that led to the business's entrance. *See Held Properties*, 2005 WL 831458 at *14. In any event, the Union here seems to have reasonably positioned the banner as far away as possible from the entrance doors while remaining on the same sidewalk. In terms of the presence of union employees, the Union reasonably asserts that leaving a billboard unattended on the sidewalk would violate local city ordinances, and that the employees do nothing but hold up the banner and silently hand out flyers on request. As noted above, their presence alone cannot be considered confrontational or coercive.

viewers, through no action of their own, to take a stance on the dispute. Handbills, on the other hand, can be easily ignored and rejected, and involve a more nuanced, less intimidating form of persuasion. This argument has apparently convinced two Board ALJs; however, every other tribunal that has viewed the issue has essentially agreed with the unions that such banners amount to "mere persuasion" akin to handbilling, and involve no coercive conduct. *See, e.g.*, *Benson*, 337 F.Supp.2d at 1278 ("The NLRB raises no allegation that union representatives shouted, patrolled, blocked entrances, acted aggressively, or even initiated verbal conversations with the public. The court has before it no evidence whatsoever that the banners provided any 'deterrent' to individuals who want to enter the businesses in question."); *Overstreet*, 409 F.3d at 1211; *Kohn*, 289 F.Supp.2d at 1166. That the banner presents its message forcefully does not transform its communicative nature into conduct.[16] Indeed, peaceful activists making fervent efforts to pass out handbills directly in front of a building entrance could create a symbolic barrier much more confrontational than the banner at issue here, but such activity would presumably be legal under *DeBartolo*. Accordingly, I likewise find no merit to the GC's core argument that the banner violates § 8(b)(4)(ii)(B).

The GC proffers several other ancillary theories to support his contention. First, he states that the banner amounts to "signal picketing." As every federal court confronted with this argument has noted – as well as one ALJ who ultimately found for the GC – the GC misconstrues this term. "Signal picketing" is a term of art in labor law that refers to certain forms of internal communication among employees, and does not cover communications made to outside consumers regarding a protest against an employer. In other words, it does not cover any "signal" or "symbol" of protest

[16] This is not to say, as the GC suggested at oral argument, that "coercion" here simply turns on whether the union members took one or more steps as part of their protest. The lack of any movement, however, is a factor that supports finding no coercive conduct here.

directed at consumers or other members of the public, such as the bannering in this case. *See, e.g.*, *Overstreet*, 409 F.3d at 1215-16; *Held Properties, Inc.*, 2004 WL 762435, at *26; *but see United Parcel Service, Inc.*, 2003 WL 21206515.

More significantly, the GC argues that the banner amounts to "coercion" because it is false and/or defamatory, and thus amounts to "economic retaliation." The GC attempts to distill this principle from the Supreme Court decision in *Tree Fruits*, 377 U.S. at 72, which held that a union can picket a neutral retail store in order to appeal to its customers that they not buy specific merchandise produced by a primary employer, but suggested that a failure to identify the struck product creates an impermissible dispute with the secondary employer. While *Tree Fruits* might indicate that the intent or content of the Union's message can be relevant, that decision addressed a picketing scenario, a distinction the *DeBartolo* court made explicitly. 484 U.S. at 579 n.4.[17] In any event, every judge (with the exception of the dissent in *Overstreet*) has disagreed with the GC's premise that there is anything false or defamatory in analogous banners, and I concur with that assessment here. Some courts note, for example, that the NLRA's definition of "labor dispute"[18] technically covers such secondary disputes, and as far as a layperson is concerned, the addition of the words "secondary" to the banner would only be more confusing. *See, e.g., Overstreet*, 409 F.3d at 1216; *Kohn*, 289 F.Supp.2d at 1169. A certain amount of pithiness or "spin" is reasonable in

---

[17] The GC also points to the language in *DeBartolo* explaining that "[t]he handbills involved here *truthfully* revealed the existence of a labor dispute and urged potential customers of the mall to follow a wholly legal course of action, namely, not to patronize the retailers doing business in the mall." 484 U.S. at 575 (emphasis added). It is unclear how much emphasis the Supreme Court placed on this factor, however, or how its analysis would have changed had the handbills been arguably or patently false.

[18] *See* 29 U.S.C. § 152(9).

such banners. *See Overstreet*, 409 F.3d at 1211. That the banner does not clearly indicate that the Union's dispute is with Starkey – i.e., it could be "more true" – does not make it "false." *See Kohn*, 289 F.Supp.2d at 1169.[19]

The GC relies on *San Antonio Community Hospital*, in which the Ninth Circuit affirmed the grant of a preliminary injunction – but not under § 10(l) – preventing union members from holding signs outside of a hospital that read "THIS MEDICAL FACILITY IS FULL OF RATS," because members of the public would "natural[ly] read[ ]" those signs to assert, falsely, "that the Hospital had a rodent problem." 125 F.3d at 1236. While the *Overstreet* dissent would have relied on that decision to vacate the district court's denial of the preliminary injunction, the majority distinguished its earlier case on several grounds, including that a natural reading of "labor dispute" on the banners was technically true. More importantly, the injunctive relief in *San Antonio Community Hospital* was based solely on defamation causes of action, and thus the court never considered whether fraudulent speech alone amounts to "coercion" under § 8(b)(4)(ii). *See Overstreet*, 409 F.3d at 1217 & n.20.

Indeed, false or fraudulent speech might be defamatory and might fall outside the protections of the First Amendment, but that does not mean it alone constitutes "coercion." *See Kohn*, 289 F.Supp.2d at 1168 ("This is an odd argument, considering that § 8(b)(4)(ii)(B) does not specifically prohibit fraudulent speech, but only threatening, coercive, or restraining conduct...The Regional Director's argument on this point is more properly framed as a counter-argument to the union's position that the requested injunction would violate its representatives' First Amendment rights.").

[19] Many people who see the sign will undoubtedly assume that the Union has a grievance with how Goodell treats its own employees. However, this is not enough to label the sign false or fraudulent, as the Union does have some form of "labor dispute" with Goodell, both technically and colloquially.

I need not fully address this issue, however, given my finding that the words on the banner are not false.[20]

III. Conclusion

Even taking into account some measure of deference to the GC, I conclude that he has not demonstrated "reasonable cause" to believe that the Union's banner violates § 8(b)(4)(ii)(B).[21] Therefore, I follow the course of the other courts that have declined to order a preliminary injunction. Of course, the NLRB retains the ultimate power to enforce the NLRA, and thus this holding does not decide the question of whether an unfair labor practice has occurred. *See Benson*, 337 F.Supp.2d at 1281. With no other issue before the court, this case will be closed.

A separate Order follows.

---

[20] That Starkey has left the Goodell site and will not return is ultimately not a significant factor in this finding. First, the Union maintains that it still has a labor dispute with Goodell over its recent association with Starkey. Second, the definition of "labor dispute" under the NLRA is broad and does not contain a temporal component. *See* 29 U.S.C. § 152(9). Third, I cannot find any weight given to this factor, nor any serious discussion thereof, in any previous "bannering" decision by a federal court or ALJ, even though it is safe to assume that some of the offending primary employers must have left their respective job sites by the time of the relevant decisions. Finally, this factor would only go to the truthfulness of the banner and not to its coercive nature.

[21] Indeed, some of the other district courts rejected the GC's petition under equally, if not more, deferential standards. *See Benson*, 337 F.Supp.2d at 1277; *Overstreet*, 2003 WL 23845186 at *2. Although Judge Feess analyzed the GC's theories in *Kohn* under the "likelihood of success" standard as part of a traditional equitable balancing test for preliminary injunctions, he ultimately held that those theories found "no support in controlling case law." 289 F.Supp.2d at 1168.

December 22, 2005
Date

/s/
Catherine C. Blake
United States District Judge